1     IN THE UNITED STATES DISTRICT COURT
      FOR THE DISTRICT OF NORTH DAKOTA
2        EASTERN DIVISION

3           Case No. 3:22-cr-010

4

United States of America,   )
5            )
        Plaintiff,  )
6            )
       vs.     )
7            )
Macalla Lee Knott,     )
8            )
        Defendant.  )
9

10

11      T R A N S C R I P T

12         OF

13     P R O C E E D I N G S

14      (Sentencing)

15

16       Taken at:
17    Quentin N. Burdick U.S. Courthouse
      655 First Avenue North
18     Fargo, North Dakota 58102

19
      January 3, 2025
20      9:07 a.m.

21

22

23

24 BEFORE THE HONORABLE PETER D. WELTE

25 COURT REPORTER:  CAROLYN TAYLOR PEKAS, RPR

```
 1                 A P P E A R A N C E S

 2      COUNSEL FOR THE PLAINTIFF:

 3      Christopher C. Myers, Esq.
            Assistant United States Attorney
 4          655 First Avenue North, Suite 250
            Fargo, North Dakota 58102-4932
 5          701.297.7400
            chris.c.myers@usdoj.gov
 6

 7      COUNSEL FOR THE DEFENDANT:

 8      Tanya M. Martinez, Esq.
            MARTINEZ LAW, PLLC
 9          3332 Fourth Avenue South, Suite 2B
            Fargo, North Dakota 58103
10          701.491.7646
            tanya@johnsonmartinezlaw.com
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    (The above-entitled matter came before
 2         the Court, the Honorable Peter D. Welte, United
 3         States District Court Chief Judge, presiding,
 4         commencing at approximately 9:07 a.m., Friday,
 5         January 3, 2025, at the Quentin N. Burdick U.S.
 6         Courthouse, 655 First Avenue North, Fargo, North
 7         Dakota.)
 8                    THE COURT:  We're on the record, and the
 9         matter before the Court is the United States
10         vs. Macalla Knott.
11                    Ms. Knott is present.  Good morning,
12         Ms. Knott.
13                    THE DEFENDANT:  Good morning.
14                    THE COURT:  She's represented by Tanya
15         Martinez, and the United States is represented by
16         Chris Myers.
17                    We are here for a sentencing hearing.
18                    And I will note for the record that Dyan
19         Jorgenson is present by interactive video from
20         the Ron Davies Courthouse and Federal Building in
21         Grand Forks, North Dakota.
22                    Ms. Knott, before we proceed, let's have
23         you placed under oath.  Would you please stand
24         and raise your right hand?
25                    THE DEFENDANT:  Yes.
```

1                      - - - - -

2                   **MACALLA KNOTT,**

3       having been duly sworn, testified as follows:

4                      - - - - -

5              THE COURT:  Thank you.  Be seated,

6       please.

7              Ms. Knott, how are you doing this

8       morning?

9              THE DEFENDANT:  I'm pretty good.  I'm

10      pretty good.  How are you?

11             THE COURT:  Well, thank you.  I am well.

12      I am much more concerned with you, to make sure

13      that you're doing okay and that your -- your

14      mental state is good?

15             THE DEFENDANT:  Yes.

16             THE COURT:  Okay.  You're not under the

17      influence of any alcohol or drugs, are you?

18             THE DEFENDANT:  No.

19             THE COURT:  Okay.  I have to ask that

20      question, as silly as it may seem, but we just

21      want to make sure that you're sober.

22             I know that you came over here from

23      Becker County, so the marshals probably were

24      transporting you quite early this morning.

25             THE DEFENDANT:  Yes.

```
 1                THE COURT:  Okay.  Did you get some
 2    sleep last night?
 3                THE DEFENDANT:  Barely, but yes.
 4                THE COURT:  All right.  Did you get
 5    enough sleep so that your head is fresh and
 6    you're ready to move forward?
 7                THE DEFENDANT:  Yes.  I've been waiting
 8    for this day forever.  Yes.
 9                THE COURT:  Okay.  Are you satisfied
10    with the legal representation you've received in
11    this case?
12                THE DEFENDANT:  Yes.
13                THE COURT:  Okay.  Very good.  Well,
14    then we will move forward.
15                I do have a Presentence Investigation
16    Report, and I note that with regards to that
17    Presentence Investigation Report, which was filed
18    less than a week ago as Document 650 in the
19    record, that there are no unresolved objections
20    to the PSIR.
21                Is that the case, Ms. Martinez?
22                MS. MARTINEZ:  Yes, Your Honor.
23                THE COURT:  Thank you.
24                And, Mr. Myers, the same?
25                MR. MYERS:  That's correct, Your Honor.
```

```
 1              THE COURT:  Okay.  Let's talk about the
 2    offense level computation in this document.  The
 3    offense level computation is set forth in the
 4    PSIR, and that starts on page 9.  Paragraph 24
 5    sets forth the base offense level at a 42.  The
 6    adjusted offense level is also a 42.
 7              I will note in paragraph 27 that
 8    although Ms. Knott had an aggravating role in the
 9    conspiracy pursuant to Comment Note 1 and 2D1.5,
10    an adjustment from Chapter Three should not be
11    applied because it's already incorporated into
12    the count of conviction.
13              Ms. Martinez, no questions about that?
14              MS. MARTINEZ:  No, Your Honor.
15              THE COURT:  Okay.  So the adjusted
16    offense level is a 42, and the Defendant is
17    afforded a two-level reduction for accepting
18    responsibility and an additional one level for
19    timely notification.  Total offense level of 39.
20              Ms. Knott has 14 criminal history
21    points, so she's Criminal History Category VI, so
22    the sentencing guideline range in this matter is
23    life.
24              Any objection to the computation of the
25    Court, Ms. Martinez?
```

1          MS. MARTINEZ:  No, Your Honor.

2          THE COURT:  And Mr. Myers?

3          MR. MYERS:  No objection, Your Honor.

4          I would note that I think the defense

5  was asking for an adjustment in the criminal

6  history category, based on oral representation,

7  because I think -- I think it's pretty clear that

8  the driving under suspension after revocations

9  have -- have driven her criminal history score

10  and category way high, so -- we discussed this

11  beforehand.  I don't have an objection.  I think

12  legally the Court can move it one category down,

13  from a VI to a V, is how I understand the law to

14  be, but I just wanted to make sure that was in

15  the record.  We did discuss that, and it makes

16  sense here.

17          We also talked to Ms. Jorgenson about

18  that, and I think Probation is in agreement with

19  that, if I'm not mistaken, so...

20          THE COURT:  Yeah.  I appreciate you

21  bringing that up.  Let's first make sure that

22  there are no objections to the computation the

23  Court has.

24          That's the case, Mr. Myers?

25          MR. MYERS:  No objection, Your Honor.

```
 1                THE COURT:  Thank you, sir.
 2            Ms. Martinez, your voice is a little
 3    softer to me, in my ears, so if we can get that
 4    microphone somehow arranged so it's more directly
 5    in front of you.
 6            Now, the criminal history -- the
 7    argument, I believe, that's being made is that
 8    the criminal history is overrepresented because
 9    10 of her 13 criminal history points are due to
10    driving after revocation convictions.
11            Ms. Martinez, do you wish to spell out
12    the argument more?  I know that you've documented
13    it as well.  Go ahead.
14            MS. MARTINEZ:  Your Honor, I think that
15    what I put in my memo explains it.  I don't
16    think -- I am aware that the Court thoroughly
17    reviews the memos and all of the attachments.  It
18    was my hope that the Court would take a look at
19    those priors and do as Mr. Myers has suggested,
20    reduce the category.  I would ask that it would
21    be reduced a couple of levels, because the points
22    were all DUSs, to Category III.
23            THE COURT:  Well, this is a request for
24    a departure due to an overrepresentation of the
25    criminal history category and the --
```

1          Ms. Jorgenson, can you please delineate

2     for me the specific guideline for the departure?

3          USPO JORGENSON:  Under 4A1.3(b)(1).

4          THE COURT:  4A1.3 -- was that "b," as in

5     "boy," 1?

6          USPO JORGENSON:  Yes.

7          THE COURT:  And -- all right.

8          So, Mr. Myers, do you care to speak to

9     the request any more than you already have?

10          MR. MYERS:  No, Your Honor.  Thank you.

11          THE COURT:  Thank you.

12          Under (b)(1):  If reliable information

13     indicates that the defendant's criminal history

14     category substantially overrepresents the

15     seriousness of the defendant's criminal history

16     or the likelihood that the defendant will commit

17     other crimes, a downward departure may be

18     warranted.

19          And a limitation on the extent of the

20     downward departure for a career offender is set

21     forth in 4A1.3(b)(3).  That does not apply here.

22          In this specific instance, it's pretty

23     clear that the driving after revocations -- as a

24     matter of fact, if all of the driving after

25     revocations were removed, Ms. Knott would be a

1    Criminal History Category II instead of a VI.

2    She was incarcerated when she signed petitions to

3    plead in these cases, and she accepted 90-day

4    sentences.

5         I do think, given the heavy impact on

6    her criminal history category, that a downward

7    departure under 4A1.3(b)(1) is warranted.

8         Now, there must be written

9    specifications.  It does say:  In departing from

10    the otherwise applicable criminal history

11    category under this policy statement, the Court

12    shall specify in writing the specific reasons why

13    the applicable criminal history category

14    substantially overrepresents the seriousness of

15    the criminal history or the likelihood that the

16    defendant will commit other crimes.

17         So the Court will do that in the

18    departure section under -- in the Statement of

19    Reasons of the judgment, but I think the parties

20    are in agreement that it does apply.  It will be

21    reduced one category, which will bring us to a 39

22    and a Criminal History Category V, which means

23    that the guideline range is --

24         Is it then still 360 to life,

25    Ms. Jorgenson?

```
 1              USPO JORGENSON:  Yes, Your Honor.
 2              THE COURT:  Okay.  Ms. Martinez, any
 3     objection to the computation of the Court?
 4              MS. MARTINEZ:  Only to the extent that
 5     we would ask that it be reduced down to a
 6     Category III, which is one category higher than
 7     what it would be if the Court completely
 8     disregarded them.
 9              Ms. Knott pled to those because she
10     wanted programming in prison; and so, you know,
11     if she had been reinstated, the normal practice
12     is to dismiss them.  It's just she wanted
13     programming, so she just pled to everything to
14     clear that up and get programming in prison.
15              THE COURT:  Mr. Myers, response of the
16     United States to that?
17              MR. MYERS:  Yeah.  Two things, Judge.  I
18     think the Court is legally bound to reduce it
19     only by one category, as I recall; but, in any
20     event, in this case the guideline is life because
21     of the minimum mandatory on the CCE count, so
22     it's a distinction without a difference.
23              THE COURT:  Yeah.  With regards to
24     Count Five, it's not actually 360 to life.  The
25     guideline is life on Count Five, and -- and to
```

1    say it's a distinction without a difference is

2    accurate.

3         The request for further departure is

4    denied.  The Court can make the finding and will

5    reduce it to writing in the Statement of Reasons

6    with regards to the overrepresentation based on

7    the driving after revocations, but the Court is

8    limited under federal law to one category, and so

9    we will follow the limits.

10        Any further objections to the PSIR?

11        MS. MARTINEZ:  No, Your Honor.

12        THE COURT:  Okay.  So -- I shouldn't say

13    "further objections" because there actually are

14    no unresolved objections.  Correct?

15        MS. MARTINEZ:  Correct.

16        THE COURT:  And, Mr. Myers, the same?

17        MR. MYERS:  Correct, Your Honor.

18        THE COURT:  All right.  So we have a

19    PSIR, then, and the Court will accept the

20    undisputed portions of the PSIR as findings of

21    fact for purposes of this hearing today, and the

22    Court does that pursuant to the Federal Rules of

23    Criminal Procedure.

24        It occurs to me that the Court has

25    something that it needs to address with the

1    parties in camera, so as inconvenient as it is

2    going to be for the full gallery here,

3    Mr. Birrenkott and Mr. Porter, the court security

4    officers, are going to assist all who are not

5    part of the legal teams of either side out of the

6    courtroom.  When I get back on the record --

7    you'll be invited in before I go back on the

8    record, so you will miss nothing that is on the

9    record, but I have something that I need to

10   address with the parties in camera.

11           So, ladies and gentlemen, if you're not

12   part of the legal teams, please exit.

13           (The observers were cleared from the

14   courtroom and the following in camera proceedings

15   were held:)

16   ████████████████████████████████████████

17   ████████████████████████████████████████

18   ████████████████████████████████████████

19   ██████████████████

20   █████████████████████████████████████

21   ████████████████████████████████████████

22   ██████████████████████████████████████████

23   ███████████████████████████████████████

24   ██████████████████████████████████

25   ██████████████████████████████████████































```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19          (In camera proceedings concluded.)
20          THE COURT:  Okay.  We are out of in
21  camera.  We're back on the record.
22          Prior to going in camera, the Court
23  accepted the undisputed portions of the
24  Presentence Investigation Report as findings of
25  fact for purposes of this hearing, and we are
```

```
 1    ready now for the recommendations of the parties.
 2             As is the standard, the United States
 3    will give their recommendation first, and then
 4    the defense will give theirs.  Ms. Knott will
 5    have an allocution, if she so desires, and the
 6    Court will then impose sentence.
 7             Mr. Myers.
 8             MR. MYERS:  Thank you, Your Honor.
 9             And I think the defense would -- there's
10    a couple people that want to speak on Ms. Knott's
11    behalf, too, just so the Court is aware, but I'll
12    be brief, Judge.
13             THE COURT:  Okay.
14             MR. MYERS:  I just want to cover a few
15    areas in this particular case in support of our
16    recommendation, and we're going to ask the Court
17    to sentence Ms. Knott on Counts Four and Five,
18    and as the Court is aware, Count One is a lesser
19    included of the Continuing Criminal Enterprise
20    charge.
21             And so in this particular case, Judge,
22    we're going to recommend to the Court a sentence
23    of 321 months with supervised release of five
24    years.
25             I just want to talk about -- a little
```

```
 1    bit about some of the arguments advanced related
 2    to the 3553(a) factors, recognizing the (a)
 3    factors are not applicable here, but I just want
 4    to briefly cover a response to those.
 5            And Ms. Martinez did a nice job of
 6    putting together the sentencing memorandum in
 7    this particular case.  And recognizing that
 8    Ms. Knott has had a difficult childhood, to say
 9    the least, that is, I think, undisputed here
10    and -- and not unlike most every case we see in
11    federal court with families.  What is different
12    here, and it goes to an aggravating factor in
13    this particular case, is she was able to navigate
14    those family circumstances and ultimately was,
15    you know, supplying her grandma with pound
16    quantities of methamphetamine and supervising her
17    father to store drugs and money and facilitate
18    money being moved to Mexico.
19            And so as it relates to an aggravating
20    factor, Ms. Knott has -- is charming and has the
21    ability to manipulate people to serve her
22    purposes -- very nice, very likeable -- but it is
23    a -- it is a natural skill that she possesses,
24    and there's almost an air of immaturity when she
25    presents.  And I don't know if that's a facade or
```

1    her personality, but it -- but it endears people

2    to her, and she has this unique ability to get

3    people to do what she wants them to do, and it

4    is, in a true sense, an illusion as to her role

5    in this organization.

6         When you look at some of the aggravating

7    factors of the nature and circumstances of the

8    offense, you look at the amount of people

9    Ms. Knott supervised in this organization, nearly

10    twice that that is required to prove the

11    continuing criminal enterprise.  I think we

12    allege nine.  It's probably more than nine in

13    this particular conspiracy.

14         And what's remarkable, Judge, is she did

15    it from a foreign country, which is no easy task.

16    Just navigating the trafficking activities and

17    ensuring that large shipments of drugs are into

18    the United States and that money is being paid;

19    the ability to influence and manipulate people to

20    ensure that the drugs arrive and the money is

21    paid is remarkable.

22         And Ms. Knott did it for two years in

23    Mexico, and she did it knowing before she went to

24    Mexico and -- and there's an argument advanced

25    that she went down to Mexico for COVID, and maybe

1    that's part of the reason; there are probably a

2    number of reasons, but it's undisputed that

3    Ms. Knott was a large-scale drug trafficker

4    before she went to Mexico.  She knew the folks,

5    at least some of the folks, in Mexico and went

6    down there and just became bigger from Mexico.

7    And that is remarkable, and it takes a unique

8    skill set that, in our view, is an aggravating

9    factor.

10          And then it goes without saying the

11    large quantities and shipments of drugs that were

12    shipped into the Midwest, just huge quantities

13    as -- as the Court is well aware and as alleged

14    in the Indictment.

15          And so those aggravating factors, in our

16    view, far outweigh the mitigating factors cited

17    by the defense in this particular case to the

18    extent they even apply.

19          And so at the end of the day, Judge, we

20    believe a sentence that is appropriate, given all

21    of the circumstances, is 320 months -- 321 months

22    and five years supervised release.

23          I think as part of the agreement we've

24    moved to dismiss Counts Two and Eight in this

25    particular case.

1          And so I think that is all I have at

2     this time.  Thank you.

3          THE COURT:  Thank you, Mr. Myers.

4          Ms. Martinez.

5          MS. MARTINEZ:  Your Honor, this was my

6     first CCE case, so it's been with me for about

7     two and a half years now, and that's no secret.

8     My client's aware of that.  I've learned a lot

9     through this case.

10         One thing that I have done is spent

11    many, many hours with my client and had many

12    conversations.  If it's a facade, it's -- it's

13    one that's been kept up unbelievably well,

14    because Macalla is always Macalla when I

15    encounter her.

16         Mr. Myers is correct.  She is very

17    endearing.  The first thing she was worried about

18    this morning when she saw me is how am I doing.

19    She said, "You're going to do a good job."  She's

20    always worried about what's going on in somebody

21    else's life, and I think that that did contribute

22    to her ability to survive in Mexico.  It's just

23    very hard to be angry with her, and she doesn't

24    stay angry with people.

25         I agree that there would be an element

1    of immaturity there, almost naivete, in that she

2    truly wants to believe the best of people, and so

3    she looked at the people in Mexico like that,

4    looked at them as being poverty stricken, and you

5    know, that's one of the things that they did to

6    get themselves out of poverty.

7            But once actually after being there,

8    things, I would suggest, did not necessarily get

9    bigger for her.  The Mexican cartel had her, and

10   they used her and used her charm and used her

11   capacity to see that good in people.

12           She befriended the women that were in

13   the family, and some of them spoke English, so

14   they were of great assistance to her.

15           And she was able to navigate her way

16   through Mexico, but she's kind of a novelty.

17   She's an American, blonde-haired, blue-eyed gal

18   who is very pretty and very charming, and that

19   did probably allow her to pass through very

20   difficult situations with some ease.

21           The coordination that occurred with the

22   people back here wasn't so much rocket science or

23   anything special particular to her case.  Once

24   Frankie and Miguel were involved, all of a sudden

25   the quantities became much higher, her fear

1    became much greater, and she didn't -- the way

2    Ms. Knott would describe it is she didn't fare

3    nearly as well as she did during the earlier drug

4    trafficking, prior to going to Mexico.

5            The profits weren't necessarily going to

6    her.  She was getting money from unemployment

7    that attributes for $3,000 a month for two years,

8    so that's approximately, what, $70,000 that would

9    have been transferred?  She guesstimates that she

10   made approximately $45,000 in profits during the

11   time that she was in Mexico.  But we don't

12   dispute that the operation didn't get bigger;

13   it's just that it eclipsed her, and she became

14   just a pawn in it.  And as indicated earlier, I

15   truly believe that if the United States

16   Government had not rescued her, she would be dead

17   today.

18           (Private discussion between the

19   Defendant and Ms. Martinez.)

20           MS. MARTINEZ:  Her mother, Tanja

21   Tilleskjor, would like to give a statement, and

22   also a friend, Ashley Schlichting, if the Court

23   would so allow.

24           I think that in the memorandum I've

25   intertwined what many, many character letters

1    have said, but those two are important to her and

2    highlight, and they would like to address the

3    Court personally.

4              THE COURT:  Thank you, Mr. Porter.

5              Yes.  You may approach the bar, ma'am,

6    and you may come past and come to the podium.

7              Please say your name and spell the name

8    for the record.

9              TANJA TILLESKJOR:  My name is -- is it

10   on?

11             THE COURT:  I don't think so.

12             Now it is.

13             TANJA TILLESKJOR:  Hello.  My name is

14   Tanja Tilleskjor, T-I-L-L-E-S-K-J-O-R.  I am

15   Kayla's mother.

16             I guess I'm not sure where to start, but

17   let me rebut what Mr. Myers said.  He's got my

18   daughter completely wrong.  She's a beautiful

19   soul.  She'll do anything for anybody, and that's

20   part of the problem.  She doesn't know how to say

21   no to people.  She'll help anyone.  You hurt her,

22   she'll still help you.  That's just who she is.

23             It's not an act, sir.  It's her.  She's

24   a beautiful person.  People want to be around her

25   because of who she is.  She makes you feel better

1        just being in her presence.

2              She did not go down there to continue no

3        empire.  She went down there to get away from

4        COVID.  She went down there with, knowing she had

5        a way back through, a passport, which later

6        didn't happen for her, so she then became stuck.

7        She was stuck down there.  She had no way to get

8        back.  She tried getting other passports sent to

9        her.  They didn't make it through the mail.  I

10       guess the Mexican mail is pretty corrupt.

11             I had to borrow her money down there to

12       pay rent, so if she was continuing her empire, I

13       wouldn't have needed to do that.

14             THE COURT:  You'll need to face the

15       front of the court.

16             TANJA TILLESKJOR:  I'm just -- you guys

17       have it wrong.  She wasn't up here doing that and

18       then going down there to continue anything.  She

19       ended up getting stuck there.  She had no other

20       means.  She had no other way.  She had no way to

21       make money to survive.  She knew -- she did what

22       she knew how to do, and we've got to believe that

23       is because of me, my mother.  It's a long history

24       that's finally ended.

25             She doesn't deserve 300-and-some months.

```
 1      I swear to God, she doesn't.  She wasn't
 2      manipulating anyone.  She has no money.  She has
 3      no car.  She has nothing.  I mean, I would think
 4      a kingpin would have all kinds of things to
 5      confiscate.  She had nothing.  She's not who
 6      they're making her out to be.
 7              And I beg you, I beg you not to give her
 8      that much time.  Thank you.
 9              THE COURT:  Thank you.
10              Please come forward.  Thank you.
11              Please proceed with your name, and then
12      if you'd spell it for the record, please.
13              ASHLEY SCHLICHTING:  Yes.  My name is
14      Ashley Schlichting, and that's
15      S-C-H-L-I-C-H-T-I-N-G.
16              THE COURT:  Thank you.  Please proceed.
17              ASHLEY SCHLICHTING:  You're welcome.
18              So I've known Kayla since I was about
19      12 years old, so it's been over 20 years.  Sorry.
20      I'm going to get emotional.
21              So I met her -- I wrote this in the
22      letter.  Sorry.
23              Thank you.
24              THE COURT:  Thank you, Marshal.
25              ASHLEY SCHLICHTING:  But I met her
```

1    biking, and we would bike up to this grocery

2    store -- I mean this convenience store near home,

3    near our home, and Kayla would be hanging out

4    with her little brother, and she would beg us to

5    go biking because she wanted some friends to hang

6    out with, and so that's how I met Kayla.  And

7    she -- like, she meshed and immersed into my

8    family.

9         And who you guys know -- like, I

10   respect, like, all of your guys' positions

11   because you were placed there for a reason, but

12   who you hear Kayla to be and the -- the bad way

13   that you're drawing it out, that's just who she's

14   been.

15        She was craving a family.  She was

16   living with her grandma.  She would come over to

17   my family's house to celebrate holidays, to have

18   dinner, to spend time and actually experience a

19   family.  I grew up in a very loving home.  My

20   parents loved everybody, and they love Kayla to

21   this day.  It breaks their heart that she ended

22   up here.

23        And she's always been supportive, and

24   that's just who she is.  She's ingrained to love

25   on you, and it's not a facade.  It seems like

1    immaturity, but she just loves life.

2          No matter what happens to her today -- I

3    know that people have to face consequences for

4    their actions, but I've been working in the

5    recovery community for several years now, and

6    it's people like Kayla that I keep pushing

7    forward because they're good people.  They grew

8    up in a messed-up situation.  She didn't have a

9    normal family to go to and do these things.  It's

10   how she was raised.  And it's nothing against her

11   family.  I love her parents to death because

12   they -- they made this wonderful person, but

13   it's -- it's -- in our recovery community, we

14   have to show love to these people.

15         I was in -- stuck in addiction myself,

16   and I'm very fortunate and blessed to be able to

17   go inside the prisons today and help people like

18   her so that they can transform their life and use

19   what they've been putting for bad to good.

20         You know, I -- I -- I strongly rely on

21   my faith.  I 100 percent believe that we can be

22   transformed and use what we've been doing in our

23   addiction and use it for good.  And I just -- I

24   pray that you see that because the judge that

25   gave me a break when I had dealt with my stuff

1    saw and had hope in me that I didn't have for

2    myself, and it wasn't until years later that I

3    can thank him for allowing me to live my life for

4    my children, for my family.

5         Kayla's a wonderful person, and if we

6    can put what she does to use in our community

7    and -- and give her that support -- because

8    that's all she's every known.  If we can give her

9    the resources and tools to be who she needs to

10   be, the -- the people that are getting stuck in

11   these systems and coming out are not the same

12   people.  It's like we -- we have to be conformed,

13   and then you get institutionalized, and it's so

14   hard to break out of it.

15        And I just ask that you see who she is

16   as a person, and it's not a bad thing.  She will

17   make you laugh.  She annoys the heck out of my

18   dad, like -- my dad will never crack -- he'll

19   never crack a joke, he'll never laugh; and Kayla

20   can sit in our living room with him, and we're

21   laughing.

22        And, like, she would call us from

23   Mexico, and my parents -- it would break their

24   heart because they knew that she was stuck.  And

25   you could hear it in her voice.  And she missed

```
 1    her family, and she missed home, and she missed
 2    us because she just loves us.  Like, she loves
 3    everybody, honestly.  She probably loves the
 4    prosecutor right now.  It's just an unconditional
 5    love.  Like, she's not going to hold anything
 6    against anybody, and I don't think that's a
 7    fault.  I think what Kayla has and possesses,
 8    yes, she used it for not so good things, but
 9    she's a wonderful person.
10         And we can -- we can benefit in our
11    community from people like her.  I just ask that
12    you consider that when you're making this
13    decision because, like I said, it's -- it's a lot
14    of time, and then for her to not be able to live
15    a life -- and I understand the people and stuff
16    that she's affected, and I'm not -- I'm not
17    trying to override that at all.  I'm just saying
18    she is a person.
19         I am no one special.  Half the people
20    that are in recovery in these -- in these pews
21    are nobody special.  We just were able to find a
22    way out because we had people to support us, and
23    we had that drive to go in the right direction.
24         And I'm telling you, what Kayla went
25    through, nobody deserves to go through.  And what
```

 1    she went through is something that will forever

 2    change her life, and I know that she will use

 3    what she's learned for the good.

 4            But I just want to thank you, sir, for

 5    all this, and I want to thank each and every

 6    single one of you.

 7            And I love you, Kayla.

 8            THE COURT:  Thank you.

 9            Ms. Martinez, is your client ready to

10    allocute to the Court?

11            (Private discussion between the

12    Defendant and Ms. Martinez.)

13            MS. MARTINEZ:  Yes, Your Honor.

14            THE COURT:  Thank you.

15            Ms. Knott?

16            THE DEFENDANT:  Yes.

17            THE COURT:  Go ahead.  What's on your

18    mind today?

19            MS. MARTINEZ:  Your Honor, I expected

20    that you would ask her questions.

21            THE COURT:  I'm just not hearing you.

22    You've got to get the mic in there.

23            MS. MARTINEZ:  I apologize, Your Honor.

24    I thought you were going to ask her questions as

25    part of the allocution.

```
 1                  THE COURT:  Sure.  My question simply

 2      is:  Would you like to make a statement to the

 3      Court, and if you would, what would you like to

 4      say?

 5                  THE DEFENDANT:  No, I -- I wrote you a

 6      letter.

 7                  THE COURT:  Yeah.

 8                  THE DEFENDANT:  And I just -- I don't

 9      know what to say.

10                  THE COURT:  It's a well-written letter.

11                  THE DEFENDANT:  Thank you.

12                  THE COURT:  You know, do you have

13      anything further that you'd like to add before I

14      proceed?

15                  THE DEFENDANT:  No.

16                  THE COURT:  Time doesn't permit the

17      Court to specifically address all of the

18      statements made by your character witnesses and

19      by the character letters or -- and most

20      importantly by your letter, but I do -- I would

21      be remiss if I didn't explain and frame the

22      issues that are before the Court today.

23                  You know, there was a statement by

24      Ashley, your second character witness to testify

25      this morning here, to make a statement, about
```

1    hearts being broken, and that's evident.  This is

2    a heartbreaking case, and it's -- it is a sad,

3    sad case.

4         Now, in court, if you're in court at the

5    state level, state court judges have discretion

6    that federal court judges don't have.  They have

7    a level of discretion that they can exercise, and

8    sometimes at the state court level how people

9    feel about you or what you've done to impact

10   their lives is something that can be taken into

11   consideration.  Now, to some extent, it can be

12   taken into consideration in federal court, too,

13   but in federal court, the judges have much less

14   discretion, the Court has much less discretion,

15   and the sentence that is imposed is to be a

16   sentence that is sufficient but not greater than

17   necessary, and that's under the Guidelines and

18   under Federal Code.

19        There's a political commentator that's

20   out there that has coined the phrase "facts don't

21   care about your feelings."  I'm not saying that's

22   the case in this courtroom, but I am saying that

23   the facts of what you have done matter a lot more

24   when fashioning that sentence, in considering the

25   statutory factors, and that's why we have

1    Sentencing Guidelines, which are advisory

2    guidelines.

3            So heartbreaking case, yeah, but also

4    another word that is important here, another

5    phrase that's important, is that this is a

6    heartland case.  Under the Sentencing Guidelines,

7    this is a case that is right in the heartland of

8    what is contemplated by United States Code and by

9    the Guidelines.

10           And Ms. Tilleskjor, law enforcement and

11   Mr. Myers have a role here, and if -- when we go

12   to trial, I often speak to the jurors about what

13   the role of everybody is in this matter.  The

14   role of the defense attorney, for example, is set

15   forth for the jury, and the defense attorney's

16   job is to zealously represent and defend their

17   client within the confines of the law.

18           And prosecutors and law enforcement have

19   a role as well, and that's to prosecute the case

20   within the confines of the law.

21           Go ahead, Ms. Knott.  If you need to

22   speak to Ms. Martinez, I can hold my thought.

23           THE DEFENDANT:  No.  Sorry.

24           THE COURT:  Are you sure?

25           THE DEFENDANT:  Yeah.

```
 1              THE COURT:  Okay.  If at any time during
 2      this hearing you need a moment with your lawyer,
 3      you just let me know.  Okay?
 4              THE DEFENDANT:  Okay.  Thank you.
 5              THE COURT:  Thank you.
 6              If we have a jury trial, the jurors have
 7      a role, and their role is the finders of fact,
 8      and the Court is the finder of law.  Everybody
 9      has their roles.
10              You know, law enforcement and Mr. Myers
11      don't need anybody to defend them or their
12      actions in these cases, but I do want to assure
13      you, Ms. Tilleskjor, that Mr. Myers would much
14      rather not be here today, he would rather be
15      doing something else on January 3rd, and that
16      these law enforcement officers would much rather
17      not have -- not be here, but they poured their
18      guts into this.
19              You know, law enforcement sometimes
20      is -- is described as intrepid, you know,
21      adventurous, but oftentimes that intrepid nature,
22      that courageous nature evolves into something
23      more, which is a -- which is heroism, and there
24      was a whole lot of heroism going on in this case
25      by law enforcement in this matter.  A lot.  A lot
```

1      that's not seen, a lot that's not even known by

2      the Court this morning.

3              You know, for those of you who have

4      training in economics, there's such a thing as

5      opportunity cost.  Right?  The idea is that

6      there's opportunity cost; that's the loss of

7      potential gain because of choices that are made

8      for other alternatives.  There's a big

9      opportunity cost here.

10             We have -- Ms. Knott, you are -- you

11     have some education and college.  Correct?

12             THE DEFENDANT:  Yes.  Yes.

13             THE COURT  You are educated; you're

14     charismatic; you're persuasive, likeable,

15     articulate.  All of these lend to the

16     heartbreaking nature of this particular matter.

17     Bright, articulate people like you that are

18     recently 32 years old --

19             THE DEFENDANT:  Yes.

20             THE COURT:  -- are -- you know, you're

21     supposed to be doing other things with your life,

22     lives.  In this case, I suspect, speaking of

23     opportunity cost, that there were probably other

24     lives that were affected or lost that are unknown

25     to law enforcement because of this particular

1    continuing criminal enterprise, and in the

2    federal system, that needs to be accounted for

3    and is accounted for.

4         Ms. Knott, you're the first person that

5    I've seen in my time both as a practicing

6    attorney and as a federal judge that I'm willing

7    to admit might be a little bit of a victim of

8    life.  This whole file here that I have -- this

9    is half of what I have on my bench.  Much of it

10   is your biography, right, your life story.  Both

11   parents involved in drug trafficking; your

12   grandma involved in drug trafficking; you working

13   closely with the cartel; your life arguably,

14   maybe not even arguably, saved by the heroic

15   actions of law enforcement.

16        You know, I always try to tell my kids,

17   don't be a victim of life.  You had a life story

18   that -- to say that it is sad and tragic is a

19   great understatement, but there's also part of

20   this that is your autobiography.  The difference

21   between a biography and an autobiography is that

22   the autobiography is the story of your life

23   written by you, and you wrote some of this story,

24   and that's what you're being sentenced on today

25   is the continuing criminal enterprise that is

1    that part.

2         Now, you're going to be sitting a

3    stretch of time, and you're going to need to do

4    some work on yourself, but by my math, when

5    you're released from federal prison, you'll still

6    be in your very early 50s.  You'll have a lot of

7    life left because you're very young now.  And --

8    and so my hope and desire is that you are able to

9    turn it around and -- and that is what will be

10   the work that is left to you.

11        Having said that, Ms. Knott, I have

12   considered the entire file in this matter, and I

13   have considered the statements of Counsel, your

14   statement, all the letters in the file, your

15   written letter, the character statements made

16   today.  I've considered the Sentencing

17   Guidelines.  I've considered the Sentencing

18   Factors under 18 U.S. Code 3553(a), and I've

19   considered all of the statutory and guideline

20   factors in the filing at Document 653.  I'm

21   granting the motion of the United States at

22   Document 653 in imposing sentence today.

23        And pursuant to the Sentencing Reform

24   Act of 1984, it's the judgment of this Court that

25   you shall be committed to the custody of the

1    Bureau of Prisons on Count Five for 321 months;

2    on Count Four for 240 months, concurrent.

3           The Court is not imposing sentence on

4    Count One.  The Court is not to impose sentence

5    on Count One because it's a lesser included

6    offense of Count Five, so no sentence is

7    pronounced on Count One.

8           On Count Four you will be subject to

9    supervised release for the statutory maximum of

10    three years, and on Count Five you'll be on

11    supervised release for ten years.

12           The statute provides that there should

13    be at least five years of supervised release.

14    Ms. Jorgenson, is that a limit of five years max

15    as well?

16           USPO JORGENSON:  It is not, Your Honor.

17    It's a minimum of five years.

18           THE COURT:  Yeah.  So the Court is

19    imposing ten.

20           And, Ms. Knott, the Court also is

21    imposing the $100 special assessment on

22    Count Four and Count Five for $200 total, and

23    that must be paid immediately.

24           Now, with regards to your supervised

25    release, you're going to be subject to mandatory

1    conditions of supervised release and standard

2    conditions of supervised release.

3              You're also going to be subject to the

4    special conditions of supervised release that are

5    delineated on page 26 and 27 of your PSIR as

6    Attachment A.  There are seven special

7    conditions.

8              Ms. Martinez, I would read all of the

9    conditions of supervised release specifically if

10   you ask me to.  If you waive reading of the

11   mandatory and standard and special conditions, I

12   would accept that waiver.

13             MS. MARTINEZ:  Your Honor, we would

14   waive it.

15             THE COURT:  All right.

16             Mr. Myers, is that to the satisfaction

17   of the United States?

18             MR. MYERS:  Yes, Your Honor.  Thank you.

19             THE COURT:  Thank you.

20             The recommendation of the Court is that

21   you assess for and participate in RDAP at the

22   Bureau of Prisons.  That would be greatly to your

23   benefit with regards to the decisions that you

24   make in the future and your cognitive structure

25   and paradigm through which you see life.  It will

 1    help you a lot, Ms. Knott.

 2              The Court dismisses the forfeiture

 3    allegation upon motion of the United States.

 4              Is that correct, Mr. Myers?

 5              MR. MYERS:  Yes, Your Honor.  I think we

 6    filed that previously.

 7              THE COURT:  Yeah.  And the Court

 8    dismisses Count Two and Count Eight as well.

 9              Additionally, with the motion at

10    Document 653, the Court grants that motion and

11    withdraws the certified prior conviction that was

12    set forth as well, and that was pursuant to the

13    Plea Agreement.

14              As indicated, the Court finds that this

15    is a case that is in the heartland of what is

16    contemplated by Federal Code and by the

17    Guidelines.

18              Ms. Knott, you have two weeks to appeal

19    this.  I know that you remember from your change

20    of plea, even though that was a long time ago,

21    that you have -- that you have an appeal waiver

22    in your Plea Agreement, which is common in all

23    plea agreements in federal court.  You reserve

24    the right to appeal in two limited instances, and

25    Ms. Martinez is an experienced attorney who can

1    advise you on that.

2            Mr. Myers, is there anything further on

3    behalf of the United States?

4            MR. MYERS:  No, Your Honor.  Thank you.

5            THE COURT:  Ms. Martinez?  Take a moment

6    with your client, please.

7            (Private discussion between the

8    Defendant and Ms. Martinez.)

9            MS. MARTINEZ:  Your Honor, with the

10   imposition of RDAP, would she also be entitled to

11   the reduction in credits?

12           THE COURT:  That is something that you

13   are going to need to research.  I can't answer

14   that.  I can tell you that after the hearing

15   perhaps Ms. Jorgenson, or if there's any other

16   probation officers around, they can maybe advise.

17   It's a -- it's a question that the Court is not

18   comfortable answering.

19           MS. MARTINEZ:  Thank you.

20           THE COURT:  Thank you.

21           Ms. Martinez, do you have anything

22   further?

23           MS. MARTINEZ:  I think, Your Honor, if I

24   heard this correctly, you went with exactly what

25   the United States Government was requesting, that

1    321 months?

2            THE COURT:  Yes.

3            MS. MARTINEZ:  Nothing further to add

4    other than I would just ask that you reconsider

5    and shave off maybe a few years, which is likely

6    what would have occurred had we come to an

7    agreement, but Ms. Knott really wanted you to

8    have all of this information and to put it in

9    front of you.  We needed this type of sentencing

10    hearing.  And that would have been 23 years,

11    which isn't much different, but it's something.

12            THE COURT:  The Court has considered all

13    of the factors set forth in the Guidelines, and

14    the sentence that was imposed is, in the Court's

15    estimation, sufficient but not greater than

16    necessary.

17            MS. MARTINEZ:  Thank you, Your Honor.

18            THE COURT:  Thank you.

19            Ms. Knott, God bless you, and good luck

20    to you in your future.

21            THE DEFENDANT:  Thank you.

22            THE COURT:  We are in recess.

23            (These proceedings were concluded at

24    10:16 a.m.)

25

```
 1                    CERTIFICATE OF COURT REPORTER

 2

 3          I, Carolyn Taylor Pekas, a duly appointed

 4     Registered Professional Reporter, DO HEREBY

 5     CERTIFY:

 6          That the proceedings were reported in

 7     stenotype by me at the aforementioned time and

 8     place;

 9          That the foregoing fifty-five (55)

10     typewritten pages contain a true and correct

11     transcript of the proceedings to the best of my

12     ability.

13          WITNESS my hand and seal this 3rd day of

14     February, 2025.

15

16

17

18

19

20          /s/ Carolyn Taylor Pekas

21     _____

22     Carolyn Taylor Pekas, RPR
       United States District Court Reporter
23     District of North Dakota
       Eastern Division
24

25
```